### NEW RIVER COLLIERIES CO. v. SNIDER et al.

(District Court, S. D. New York. April 18, 1922.)

1. Exchanges ⬅15—Distribution of assets of Tidewater Coal Exchange.

The Tidewater Coal Exchange was a voluntary association to which during the war the coal administrator required all coal for export to be consigned. Under the practice of the exchange all coal received was distributed into separate pools according to grade; each shipper being allowed to take out of any pool the quantity he had shipped into it, but with a provision that by permission of the commissioner he might temporarily overdraw from any pool. Under the rules a member's account with one pool had no bearing on his account with another pool, "unless said member neglects to make up existing shortages," but it was provided that in closing accounts, when differences existed between the tonnage shipped in by a member and the tonnage loaded out, the executive committee should name a price for the tonnage involved and the Commissioner should authorize such debits or credits as might be necessary properly to adjust the differences. On closing the exchange there was a considerable amount due from members on account of overdrafts not made good, and corresponding credits to other members. A portion only of the sums due the exchange were collected. *Held* that, for purposes of final settlement,

the accounts of the different pools were not to be adjusted separately, but all were thrown into hotchpot, and each creditor member was entitled to such proportion of the entire fund collected as his claim bore to all the claims.

**2. Exchanges ⊗=4—Coal shipped by members to Tidewater Coal Exchange remained property of shippers.**

Under the rules of the Tidewater Coal Exchange, title to coal shipped by members and placed in the several pools did not pass to the exchange, but remained in the shippers as co-owners in proportion to their contributions.

In Equity. Suit by the New River Collieries Company against Girvin M. Snider and Joseph Wilson Howe, individually and as representatives of the Tidewater Coal Exchange, and the Guaranty Trust Company of New York. Decree for defendants.

Final hearing on a bill of equity brought by the plaintiff, a shipper of coal to the Tidewater Coal Exchange between November 6, 1917, and April 30, 1920. The exchange, an unincorporated association, was originally a voluntary association organized for the purpose of speeding the delivery of coal during the war. On November 6, 1917, the coal administrator passed an order compelling all shippers, whether members or not, to ship coal to tidewater under its rules, and the plaintiff was thereupon forced to ship in that way, though it never joined the exchange.

The general plan was to receive and hold all coal shipped by all members in separate pools, fixed in accordance with classifications of quality made by the exchange's officials, and to allow any member to take out of any pool so created the same amount of coal as he had shipped into it. It was also provided that the commissioner of the exchange might permit overdrafts of members from any given pool, which were to be restored in kind without delay. If the restoration was not made, the rules provided for a final settlement when the account was closed by the commutation of coal into money, and it is with this feature of the exchange's dealings that this case is concerned.

When the exchange closed on April 30, 1920, the coal remaining to their credit in the several pools was all withdrawn by the members, and surpluses of members deficient in other pools was presumably disposed of by the exchange itself, though that does not appear. In any case there was a gross deficiency of about 200,000 tons in overdrafts, which the exchange has tried to collect in commuted money payments. Of this deficiency of about $1,600,000, they have succeeded in collecting $400,000, of which a substantial part was in payment for overdrafts made from pool one. The plaintiff's credit of some 2,300 tons of coal was in pool 1, and its theory is that it and the other shippers having credits in that pool are to be regarded as in equity the owners of so much of the collections as were paid to settle pool 1 deficiencies.

The exchange promulgated two sets of rules—the first on June 20, 1917; the second, on April 24, 1919. The important rules to this suit are old rules 9, 10, and 12, and new rules 22, 28, and 23. They are as follows:

"9. The assignment of coal to members shall be authorized by the exchange, and no assignment shall be made in excess of the tonnage which such member or members have in the designated consigning pool.

"No member shall be entitled to any coal from a designated consigning pool, when the accounts indicate that the member has overdrawn from that pool, unless, due to some extraordinary conditions, the commissioner may deem an exception advisable.

"This shall not prevent a member from borrowing coal in the pool from any other member having a credit, but such transactions must be between individual members and authorized by them to the commissioner in writing."

"22. The assignment of coal to members shall be authorized by the exchange, and no assignment shall be made in excess of the tonnage which such member or members have in the designated pool, except at the dis-

cretion of the commissioner, or deputy commissioner. No member shall be entitled to any coal from a designated pool when the accounts indicate that the member has overdrawn from that pool, unless, due to some extraordinary conditions, the commissioner or deputy commissioner may deem an exception advisable.

"Debits of any member in any pool shall be made good immediately on demand of the deputy commissioner."

"12. The account of a member in one designated consigning pool shall not have any bearing on his account in another pool at the same port or other ports. Members, however, shall be permitted to offset overdrafts of one pool with shipments made to the same pool at another port, subject to the approval of the commissioner."

"23. The account of a member in one designated pool shall not have any bearing on his account in another pool at the same pier or other piers, unless said member neglects to make up existing shortages. Members, however, may be permitted to offset overdrafts in one pool with shipments made to the same pool at another pier, subject to the approval of the commissioner."

"10. When differences between the tonnage of coal shipped by a member and the tonnage of coal dumped into vessels for his account exist, and the differences cannot be adjusted either by additional shipments or exchange of coal, the executive committee shall name a price to the commissioner of the exchange for the tonnage involved, and the commissioner shall authorize such debits or credits as may be necessary to properly adjust the differences."

"28. In closing accounts, when differences between the tonnage of coal shipped by a member and the tonnage of coal dumped into vessels for his account exist, and the differences cannot be adjusted, either by additional shipments or exchange of coal, the executive committee shall name a price to the commissioner of the exchange for the tonnage involved, and the commissioner shall authorize such debits or credits as may be necessary to properly adjust the differences, after settlement has been made by the members affected."

From February, 1919, to February, 1920, the order of the coal administrator was not in force and shipments to the exchange were voluntary. At the end of February, 1920, the plaintiff had a deficiency of about 1,000 tons, and the coal in virtue of which it here claims was all shipped during March and April of that year. During that time it was under the compulsion of the coal administrator's order.

The individual defendants are the chairman of the executive committee of the exchange and its commissioner or chief executive. The Guaranty Trust Company is the depository of the fund. After the suit was commenced, the trustee in bankruptcy of the exchange intervened and has conducted the defense.

Thomas D. Thacher, of New York City (Louis S. Weiss, of New York City, on the brief), for plaintiff.

James F. Curtis, of New York City (Chauncey Belknap, of New York City, on the brief), for defendants.

LEARNED HAND, District Judge (after stating the facts as above). [1] This is a bill in equity, based upon the rights of property of the members of pool 1, whom the plaintiff seeks to represent. It must therefore depend upon some common interest of all the members of that pool in property which has come to the hands of the defendants. These have only cash and no coal, so that the question is irrelevant whether the members of a pool were originally, and indeed always remained, co-owners of all the coal in that pool, or whether they or the exchange had title to it. The collections here in suit arose out of loans or sales of coal made by the commissioner, with the con-

sent of all the members, to certain of them on their individual responsibility. The question whether these collections should be apportioned among the several pools is an altogether different question from whether the coal itself was owned in common by the pool members. Indeed, it may be conceded here for argument's sake that shipment into a pool, while it of course passed title out of the shipper to the members of that pool, gave the shipper in exchange an aliquot share in the whole pool, dependent upon his proportion of the whole.

It will first be necessary to analyze the rules of the exchange, so as to learn under what right these collections arose and whether they are the proceeds of coal tortiously converted. If so, the plaintiff's right to treat them in equity as still their own would seem to follow, and the equity of the bill to be established. And indeed it would not follow that the bill must fail, even if the collections are not the proceeds of converted coal; that is a quite independent question, depending upon what intent one must spell out of the general structure of the association. It is essential to the solution of both these questions that the plan should be exposed so far as it is relevant to the overdrawing of coal. I think that it appears beyond controversy that the members always intended· on occasion to loan or sell to pool members a part of the pool coal.

The rules (old rule 9 and new rule 22) from the outset gave power to the commissioner to allow single members of any pool to overdraw. Indeed, new rule 22 allowed him to authorize a member to assign to another more than he had in the pool, thus extending his original authority. This, of course, must always have resulted in making the pool insolvent in coal and dependent for its ultimate liquidation upon the responsibility of the withdrawing member. Old rule 12 enacted that a member's overdrafts in any pool might not be made up by his surpluses in other pools, and until its amendment by the promulgation of new rule 23 it might any way be argued that it forbade a hotchpot of all his holdings in all pools, even upon final liquidation of his accounts. But new rule 23 was especially limited in its application to the period during which a member should not neglect to make up his shortages, here referring I think to rule 28, and the inference is inevitable that, if he did so neglect, his account in one pool should have some "bearing" upon that in others.

To learn what in that event the "bearing" of his account in other pools should be, we should look to new rule 28, which is old rule 10, somewhat clarified, but not in my judgment really changed. At any rate it is the new rules which govern this case, because at the end of February, 1920, the plaintiff had itself overdrawn about 1,000 tons of coal, and the new rules went into effect on April 24, 1919. Now new rule 28 provides for the closing of members' accounts, when there are unadjusted "differences" between the amount of coal shipped by a member and that delivered under his orders. If these are not "adjusted," either by shipping more coal or getting assignments from other members, the executive committee shall "name a price * * * for the tonnage involved." Nothing is said as to what shall be done to collect, although the means adopted, in which Carpenter concurred, was to threaten suit; but it is provided that, "after settlement has been

made by the members affected," the commissioner "shall authorize such debits and credits as may be necessary to adjust the differences."

If one follows out this language in its necessary application, it will appear that the accounts of the delinquent members, who fail to restore in kind or by assignment (as primarily they are bound to do), must be liquidated on a hotchpot of all their accounts, the rule thus fitting in with the addition made to rule 12, when new rule 23 was drafted. For example, if a member has deficiencies in pools 1, 2, and 3, and surpluses in pools 4, 5, and 6, it would be his duty under new rule 23 to restore his position in pools 1, 2, and 3, regardless of his surpluses. But when he neglects "to make up existing shortages," and so ignores his primary obligation, new rule 23 ceases to apply, and his account in one pool begins to have a "bearing" on his accounts in others. Thereupon the time arrives to "close" his account, and the executive committee must name prices at which both deficiencies and surpluses can be commuted into money. After he has "settled" on these prices, the commissioner must enter the proper debits and credits. The "settlement" cannot mean the payment into pools 1, 2, and 3 of his deficiencies: First, because new rule 23 has ceased to apply; and, second, because that could never require the commissioner to enter any "debits." Each payment would be a credit to the member in that pool in which it was made, and would balance his account in that pool. If, however, he paid only his net balance in all the pools, it would become necessary for the commissioner to debit his account in pools 4, 5, and 6 with the commuted value of his surplus, and credit his accounts in pools 1, 2, and 3, not only with the cash actually paid, but with the same commuted value of the surpluses which were debited in pools 4, 5, and 6.

[2] There seems to me no doubt that this is what new rule 28 means, and that the total result of all three rules, taken as a part of the general plan of the exchange, was therefore as follows: The members primarily meant to organize an association which should merely classify and mingle their coal into separate masses, of which they were presumptively to remain co-owners. There is no sufficient reason to suppose that they intended the title to pass to the exchange. So, far, their purposes were the same as in the Lake Erie pool, which had served in general as a model for the exchange.[1] But it is equally clear that for reasons of convenience and speed in delivery, quite congenial with the general purposes of the exchange, they meant to go further than this, and to authorize their executive at his discretion to allow a pool member to take out some of the common property of the pool on credit. Not only do old rule nine and new rule 22 very clearly confer that power, but it was constantly exercised throughout the existence of the exchange, and the plaintiff had its benefit in very substantial overdrafts, as already noted. The withdrawing member must restore in kind; but, if he neglects to do so, he must pay his obligations in cash at commuted prices. In estimating those obligations the commissioner should take into account his standing in all the pools, commuting

---

[1] It is, however, to be observed that even the Lake Erie pool had a rule (rule 4), which provided for the fixing of prices when a member was overdrawn. The possible application of that rule is not apparent, but it shows at least that even in that pool overdrafts were in contemplation.

his surpluses and deficits into money, and entering the proper items of debit and credit, so as to make his account, then treated as single, exactly balance.

Such was the plant or structure, and it is entirely irrelevant that all the accounts were kept in coal up to the time of closing. They could not have been kept in anything else until that time came, under new rules 23 and 28. If so, it makes no difference, as I have already said, whether or not the coal in the pool continued to be a mass of fungibles held in common, and the authorities on that question need not be considered. The only relevant question is whether, after a delinquent member had "settled" and paid, and after the proper debits and credits had been entered, the property so obtained was owned by the several pools in the proportions of their credits, or whether it was general assets of the exchange. The property, it will be observed, is cash paid in and surpluses of coal in other pools. The alternatives are these: Either to regard the money and the surplus as owned by the exchange as a unit, or as shared in by the several creditor pools in the proportions of their credits.

Let me assume the second and try to work out the resulting situation. Suppose, for example, that an accounting member was a debtor to pool 1 for $5,000, to pool 2 for $10,000, to pool 3 for $15,000, and had credits in pool 4 for $4,000, in pool 5 for $5,000, and in pool 6 for $6,000. He would pay $15,000 to the Exchange, which would be deposited in a bank. If the plaintiff is right, pools, 1, 2, and 3 would be co-owners of this $15,000 in proportions of one-sixth, one-third, and one-half, and of the member's coal surpluses in pools 4, 5, and 6. But if the matter is to be treated in this way a further complication presents itself: The surplus of the supposed member in pools 4, 5, and 6 would be wholly a coal surplus only in case those pools were themselves solvent in coal. Suppose, however, that overdrafts had been allowed to members in those pools also. Then obviously the surpluses of the accounting member would in part be themselves made up of the claims against withdrawing members of pools 4, 5, and 6. But the withdrawing members of pools 4, 5, and 6 might in turn have surpluses in pools 1, 2, and 3, which must, upon settling their accounts, be credited to pools 4, 5, and 6, and debited against pools 1, 2, and 3. Therefore, if the property were to be treated as divided between the pools, each pool sharing in some ascertainable proportion in the collections, it might, and probably would, happen that part of the property which pools 1, 2, and 3 would hold as co-owners would be coal held in those pools themselves, but in progressively complicated proportions. It is obvious that further complications would arise in carrying out this theory, which would end in a maze of bewildering cross-allocations.

The resources and ingenuity of accountants are large, and I will not say that it is impossible to figure exactly in what proportions the several pools would become co-owners in the balances received and in the surpluses in the several pools after the members had all accounted. Yet in interpreting the intention of men of affairs we must, of course, assume that their purposes are practical, and do not gratuitously in-

volve intricate problems of accounting. It is no doubt fictitious in a sense to speak of any positive intent in such cases, just as it is in ascribing an intent in many other cases of contract. What we do is to decide as best we can what the parties would have intended, had they been faced with complications which subsequent events created, and, having judged as nearly as we can what they would have said, we impute to their words a purpose to effect that intent. Language does not, and in the nature of things cannot, provide in advance for all the permutations of circumstance which the future may present.

In the case at bar it seems to me extremely unreal to impute to the members of this exchange a purpose so difficult of realization, and one which, if realizable at all, could be fulfilled only by the most complicated calculations. Rather I think one should assume that, when the commissioner allowed a member to withdraw coal from a pool, it was expected that although, if the member restored in coal, it would of course go back into the pool, if he defaulted, his monetary obligations were between him and the exchange as a whole. While for many purposes the pools were separate, it must always be remembered that the exchange was a single association, governed by one executive committee and by one commissioner, with his deputies, who had general supervision over all pools. I find it very hard to suppose that in the face of rule 10 (new rule 28), and especially of the amendment of rule 12 (new rule 23), the settlement of his accounts was to be on any other basis than as a creditor to the whole exchange. Certainly in form the settlement was meant to be just that, and the imposition upon that form of the pattern of a number of mutually independent co-owning pools should be supported by convincing proof, which I do not find either in the rules or in the practice under them.

There does not seem to me any inherent improbability that the members should have been willing to accept jointly the risk of the financial responsibility of those who might not restore in kind—rather the contrary. No one could be sure that he would be a net creditor in any single pool, presumably all would have transactions in more than one. The plaintiff's change in two months from a deficiency of 1,000 tons to a surplus of over 2,000 is a glaring instance of what might happen. Indeed, owing to the constant reclassification of the pools, a member who shipped the product of only one mine or one vein might find his shipments, this month in one pool, and the next in another. Nor was it conceivably possible to know in advance what the standing of any member in his several pools would be when his account was closed. It would therefore be altogether erroneous to look at the creditor members of any given pool on April 30, 1920, as a separate class, who had all along been the creditors in that pool and that alone. They were in no sense a group of persons dealing only among themselves, and not coincident in any way with the members of other pools. On the contrary, they were all members of the exchange, always, or at least often, in several pools at the same time, as debtors in one and creditors in the other, with their rights dependent upon their own several surpluses and deficiencies, and upon the uncertain and variable surpluses and

deficiencies in all the pools of such overdrawing members as in the end turned out to be irresponsible.

In view of these shifting and interconnected relations there is no reason to suppose that the members intended the risk of insolvency of an overdrawing member to be borne by the pool members of the particular pool from which he drew. Being presumptively members of some other pools, they were in one aspect his creditors, and in another debtors to themselves for his surpluses, and the amount of each item would remain variable and indeterminate. The more reasonable interpretation is, I think, to regard each withdrawing member as an eventual debtor of the whole group, which must collectively bear the losses arising from his insolvency.

Although the consequences of this feature of the plant were not before him, Carpenter, the plaintiff's vice president, certainly understood that in his own dealings with the exchange all accounts were to be brought into hotchpot, and he settled on that basis. The plaintiff can now scarcely take a different position; but, if it can, it is certainly not a negligible consideration that, when the matter came up, it assumed, and acted on the assumption, that the liquidation was to be conducted with the Exchange as a whole. Furthermore Carpenter took part without dissent in the proceedings of the executive committee, either in person or by a proxy whose doings were afterwards brought to his notice, under which the settlements were liquidated in the same way.

None of the authorities cited touch the only questions which I deem material. I have assumed that the pool members retained their interests in the coal shipped to the separate pools. The plaintiff may be right as to that; it is not necessary to consider whether the mere right of the commissioner to permit withdrawals affected their title. But we are dealing with coal which the commissioner did sell or loan, and sell or loan with authority. There can be no question as to the title of that coal; it passed to the withdrawing members. No case that I know throws any light on the question whether the resulting chose in action belonged to a separate pool, or to the exchange as a whole. For the reasons already given, I conclude that the final money payment did not.

The bill will be dismissed, with costs.