### COYLE v. MORRISDALE COAL CO.

(District Court, S. D. New York. June 6, 1922.)

1. **Courts** ⊚⟹343—**Association may sue member at law on contract.**

The common-law rule that members of an unincorporated association may not sue at law one of their number on a contract between himself and them was based on procedural reasons, and in a state where by statute such objection has been removed a federal court, in conformity with state practice, may entertain such an action.

2. **Exchanges** ⊚⟹4—**Tidewater Coal Exchange authorized to change member's status to that of debtor.**

Under the rules of the Tidewater Coal Exchange its executive committee was authorized, on closing a member's account, to change his status from that of a member to a debtor of the exchange.

---

**3. Exchanges ☞4—Right to commute obligations of members.**

Under the rules of the Tidewater Coal Exchange, by which the different pools of coal were owned by the members contributing thereto, the exchange had no right of action against a member for failure to make good overdrafts of coal from a pool until the closing of his account, when it was authorized to commute his obligation into a money debt to the exchange, and the amount of such debt is determined by the market price of the coal due at the time the account was closed.

At Law. Action by William Radford Coyle, trustee in bankruptcy of the Tidewater Coal Exchange, against the Morrisdale Coal Company. Judgment for plaintiff.

James F. Curtis and Chauncey Belknap, both of New York City, for plaintiff.

Peale & McLaughlin, of New York City, for defendant.

LEARNED HAND, District Judge. The first question is purely formal: Should this be an action at law or a suit in equity? While, so far as I can see, nothing turns on it, except whether the pleadings should be reframed, it is pressed by the defendants in all the cases, and may make some difference in the scope of review on appeal. In any event, it must be answered.

[1] At common law it is the general rule that the members of an unincorporated association may not sue at law one of their number on a contract between himself and them. McMahon v. Rauhr, 47 N. Y. 67; Bullard v. Kinney, 10 Cal. 60; Cheeny v. Clark, 3 Vt. 431, 22 Am. Dec. 219; Holmes v. Higgins, 1 Barn. & C. 74. Whether this was merely for the procedural reason that, since all members had to be joined as parties plaintiff, the defendant appeared both as plaintiff or defendant, or whether it was because the common law conceived it impossible that an obligation could exist between a man and himself in company with others, I am not sure. Cases like Pierce v. Robie, 39 Me. 205, 63 Am. Dec. 614, where the action was by trustees, scarcely raise the point. The distinction would be determinative here, because, although the procedural difficulty does not exist, the action being by a trustee in bankruptcy, it may well be argued that if the underlying rights remain as they were, and there was no obligation between the members and the defendant which the common law would recognize, none such could pass to the trustee.

That there is no unanswerable objection to recognizing the existence of such an obligation, the rule in equity shows. There even between partners it was not necessary in every case to have an accounting, but equity would often entertain bills sounding in contract and filed against a partner by the firm during its continued existence. Possibly this involved a larger recognition of the firm as an entity than our law has ever been willing to confess, but it makes no difference. The defendant does not dispute it, and indeed asserts that the plaintiff here must sue in equity.

The question as it appears to me is this: Whether, under statutes such as section 1919 of the New York Code of Civil Procedure, the judges have not come to treat obligations between the member and the

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

association as raising true obligations on which action lies. If so, the original inability to bring such actions must be set down to procedure only, or perhaps to an unconscious change in the notions of the judges themselves. I have not been able to find many cases. In Westcott v. Fargo, 61 N. Y. 542, 19 Am. Rep. 300, the member was plaintiff and sued at law in contract. The court held the action good, apparently on the theory that the statute allowed it. In Reddish v. Pinnock, 8 Exch. 213, the statute certainly need not have been treated as more than procedural. Yet the court held that it permitted an action on an account stated, because it applied to all transactions between members and the association as though they were separate persons. On the other hand, in Huth v. Stamm, 61 Conn. 227, 23 Atl. 1084, the precise contrary was held, on the theory that such a statute did not change the substance of the rights.

It must be owned, therefore, that the authorities are not altogether clear. It seems to me that since, had the action been brought in the state court, Westcott v. Fargo, supra, would have ruled, and since the differences between equity and law have now become of much less importance, as the practice has coalesced, I am permitted to assume that the equitable rule is applicable to actions whenever no procedural difficulties arise. Strictly, no doubt, New York cases are not authoritative; but they may be persuasive, and in a case like this, where one branch of the law has for long recognized the obligation, it seems to me in every sense desirable to assimilate that rule wherever it can be. I therefore hold that the trustee may sue a member at law upon an obligation arising out of the constitutive rules of the association, and that no change in the pleadings is necessary.

[2] All this, of course, presupposes that the defendant owes a debt to the exchange, and this brings up the questions which I decided in the New River Collieries Case, 284 Fed. 287. I may refer to that opinion for my reasons for thinking that the structure of the exchange permitted its executive committee, upon closing a member's account, to change the member's status as a member of his several pools into a debt between itself and him. Accepting that analysis, there remains only the question whether the right to close the accounts of all members, and to commute their overdrafts from coal to money, was here regularly exercised.

[3] Various times are suggested for taking the value of the coal in the commutation. The first is its value when the overdraft was made; but that is clearly wrong. The overdraft created an obligation which certainly could not have become due till demand made. The second is that, as the obligation under rule 22 was to restore at once, damages should be fixed as of that time and upon a default. Thus it is argued that the first demand to restore on February 15th fixed the commutation prices as of that day; or, if not then, the second demand to restore on April 15th. This notion appears to me to involve a misconception of the character of the exchange. As I have elsewhere said, I regard it as only a series of pools co-operatively managed by the exchange; the coal being, however, owned by the members of each pool collectively. Therefore I do not believe that the exchange had any right of action for failure to restore in kind to any given pool. So far

as such rights existed at all, they belonged to the other co-owners of that pool, because it was carefully provided that the holdings of each pool should be separately regarded.

The right of the exchange supervened only when it became necessary to close out a member's account. Then his holdings in all pools came into hotchpot and might be commuted into money. The exchange did acquire at that time a right of action against the member; but it was for money, not for coal. If I am right, then obviously no demands to make good overdrafts created any right of action, though they were conditions precedent to closing the accounts, because they gave the members a chance to fulfill their separate pool obligations. It was the closing of the accounts, after persistent neglect to restore, which set in motion the machinery of commutation and created the ensuing debt.

Now the demand of February 15th can by no stretch be supposed to be a closing of the accounts. More may be said for the demand of April 15th, because that mentioned the closing of accounts on April 30th. However, all that was then announced was a purpose to close accounts on April 30th, and it was clear that this might depend upon whether the delinquent members complied with the demand. It was one thing for the exchange to say that they wished to close accounts on April 30th, and another actually to close them. Certainly the executive committee never intended to close them until July 1, 1920. I think they had a reasonable latitude to give extensions to delinquent members before adopting the extreme measures of collecting in money and in invitum, and it scarcely lies in the mouth of such members to complain that they were treated with too much lenity.

There is every justice in holding the defendant to the prices fixed. It had always the power and the right to restore its overdrafts; with it rested the right to pick that time which it thought best to its advantage. If it thought the market would fall, no doubt it was wise in waiting to "cover" its commitments, like a broker who is "short" of a stock. It is unfair now, when the price rose, and after the executive committee, perhaps unwisely, gave it further extensions, to complain that it should be held for the price at which the account was finally and after repeated forbearance closed. As well might a stockbroker's customer insist that his stocks should be figured at the prices of the first demand of the broker, because the broker had given him a respite before closing him out. Having chosen to withhold restoration, and having had the benefit of the market fluctuations, every consideration of fair dealing requires it to accept the resulting loss. The coal, had it been delivered, would have been available to creditor members; theirs would then have been the option to hold or sell. That option the defendant enjoyed, and took from them, and now wishes to impose the cost of it on them. I must own that I am totally unable to conceive on what principles the defendant should be allowed to play this game of "Heads I win, tails you lose."

Two points remain: First, the confiscations "on wheels"; second, the amount of 91.19 tons, which the exchange failed to include in its account. The first falls within my ruling as to confiscations after actual receipt by the exchange, which I hold are on member's account, as will appear in the McNeil·Case, 284 Fed. 298. That being true, it

is unnecessary to consider whether the pool began f. o. b. the mine or on arrival at tidewater. Discussion of the second I reserve for the Johnstown Case, 284 Fed. 301, where the amount is much greater. As I have allowed it there, I shall allow it here.

Verdict directed for the plaintiff for the full amount demanded, with interest, less the commuted value of 91 tons.