## COYLE v. ARCHIBALD McNEIL & SONS CO., Inc.

(District Court, S. D. New York. June 6, 1922.)

I. Exchanges ⟨⟩4—Coal confiscated after shipment to Tidewater Coal Exchange held chargeable to shipper.

Coal shipped by defendant to Tidewater Coal Exchange, which under its rules became common property of all members contributing to the pool, was seized while still in the cars under the government order of January 14, 1918, providing that all coal shipped after it went into effect should be subject to confiscation, and that when seized such coal should be regarded as belonging to the consignor, regardless of any previous passing of title. Payment for the coal seized was made to and accepted by defendant. *Held* that, though title had passed, the coal had not lost its identity, and under the terms of the order the loss was that of defendant, which was not entitled to credit for the coal with the exchange.

2. Bankruptcy ⟨⟩154—Claims purchased by debtor held not allowable as set-offs.

Where bankrupt, Tidewater Coal Exchange, was a voluntary association organized as an agency for its members in the handling of coal, having no capital and making no profits, so that the expenses of collecting from recalcitrant members or insolvency of any debtor member necessarily rendered it insolvent, claims of creditor members, purchased by a debtor member at large discount within four months prior to bankruptcy, with knowledge of the insolvency of one or more of the debtor members, and with a view to such use, *held* not allowable as set-offs under Bankruptcy Act, § 68b (Comp. St. § 9652).

At Law. Action by William Radford Coyle, trustee in bankruptcy of the Tidewater Coal Exchange, against the Archibald McNeil & Sons Company, Inc. Judgment for plaintiff.

James F. Curtis and Chauncey Belknap, both of New York City, for plaintiff.

Peale & McLaughlin, of New York City, for defendant.

LEARNED HAND, District Judge. This is like the Morrisdale Case with two exceptions: First, the confiscation of some 3,000 and odd tons of coal which had actually arrived at tidewater; second, the set-off of credits purchased after the exchange closed.

[1] The first arose from the right exercised by the government during the coal shortage to seize coal anywhere and belonging to any one. If the matter rested there, I should regard the confiscation as a pool loss. I have already in the New River Collieries Case, 284 Fed. 287, stated my reasons for believing that each pool was to be treated as a mass of fungibles owned in common, the shares being determinable by the deposits and withdrawals of the members. Confiscation was

a loss which the members must therefore bear in common, and while the compensation would go to the pool, it would be immaterial that the actual coal seized happened to be traceable to a given member. The earmarking of cars would become irrelevant, since upon their arrival it was the common purpose of all that they should lose their proprietary identity.

The plaintiff argues that this is not so because of the nature of the order under which the confiscation took place. This order (promulgated January 14, 1918) provided that all coal shipped after it went into force should be subject to confiscation, and that when seized any coal should be treated as still belonging to the consignor, regardless of any previous passage of title. In short, all sales were subject to defeat by condition subsequent. Thus, says the plaintiff, the coal seized was as much on the account of the defendant as though it had been seized at the mines. That, in my judgment, would depend upon how far the identity of the coal was in fact lost. To take an instance, suppose that this coal, instead of being kept in cars, had been dumped into huge piles, so that the identity of each shipment had disappeared, and that the confiscation had been made by taking out of the pile. Ex necessitate the loss would have fallen on the pool as a whole, because it would be impossible to say whose coal had in fact been taken.

Under the rules of the exchange the coal did lose its separate ownership when it arrived, but obviously it did not lose its traceable identity in fact. The result of the consignment was to transfer property in those cars to the pool members in common, but that was all. The transaction was like a sale to the pool members as a whole. Under the order of January 14, 1918, every such sale was conditional upon any subsequent confiscation, which, when it occurred, defeated the title so acquired, and made it as though the coal had been seized before title passed. In the case of coal in a pile, the actual confusion would have prevented any one from saying whose was taken, and the order would de facto be inoperative; but there was no confusion as things were, only an agreement by which the interest in those ascertainable cars passed from the defendant to the members of the pool. The order, if valid, must operate where it could; its limitations were only in execution.

Moreover, it is significant that the parties treated the transactions in this way without dissent. The defendant collected from the "divertees" of the coal and did not offer to restore to the pool the compensation; nor did they claim till this action was brought that their credit in the pool remained untouched. The validity of the order, which was not retroactive, is not challenged, and, being valid, its effect was to undo any transaction entered into between the consignor and any one else. I find, therefore, that the defendant is not entitled to credit for the coal so seized, but must pay upon its overdrafts as settled without it.

There is, of course, hardship in this; but I cannot see why the creditors at large should bear it. Clearly they got no benefit from these shipments, and while the risk of the losses might, indeed, be justly borne by all, their position is the same as any buyer's, who, having

bought coal, had it confiscated. Such a buyer could demand further delivery, because that actually made was subject to a condition, which, when it occurred, made it void.

The seller would be liable again to deliver coal at the risk of its change in price. This risk the régime of government control must impose on some one, and I see no reason to suppose that the consignee was better able to endure it than the consignor. Therefore I decline to allow this credit.

[2] The second point is of the credits bought within the four months period prescribed under section 68b of the Bankruptcy Act (Comp. St. § 9652). It is proved that these were purchased "with a view" to use them as set-offs, and it is conceded that the exchange was then insolvent. The point, therefore, turns on notice of insolvency, and depends upon the evidence. It must be remembered that the exchange was an association wholly without capital, and that therefore it could under no circumstances pay its claims in full unless all the debts were paid without any deduction. For every debt outstanding there was a precisely equivalent credit, not only in the amount of tonnage, but in price. The insolvency of a single debtor, therefore, made it impossible for the exchange as a whole to be solvent.

Indeed, the hazard of insolvency went even deeper than this. The railroads had agreed to pay the "expenses of the Tidewater Coal Exchange incurred by or under the direction of the commissioner, to be arrived at in accordance with rule 17" (later rule 35) "of the exchange." In practice these expenses included salaries, rent, inspection, and some miscellanies. The railroads withdrew their "support" on April 30, 1920, and perhaps had the right to do so whenever they chose. Whether they had or not, it cannot be argued that they are liable for the expenses of collecting the accounts of delinquent members. These are not necessary expenses of administration, of the operation of the exchange as a governmental or collective agency. They arise from the refusal of some members to pay their debts, and the railroads cannot be supposed to have guaranteed part of the members, i. e., the creditors, against the rest, i. e., the debtors, in their mutual dealings.

Therefore it certainly follows, in view of the confusion and refusals to pay which had occurred before January 12, 1921, that the exchange would be obliged to pay substantial charges which could only come out of its collections. At least by January 12, 1921, if every debtor in the end proved solvent and could be forced to pay in full, it would only be after extended litigation, and there could not possibly be a dividend of 100 per cent. on the claims. That being so, what on January 12, 1921, and thereafter was the "fair valuation" of the exchange's assets, under section 1 (15) of the Bankruptcy Act (Comp. St. § 9585)? What is the fair value of a claim known to be subject to doubtful and extended litigation? Obviously it is less than its face under any method of appraisal. Perhaps the exchange might have been solvent on July 1, 1920, if all the debtors were sound and all were tractable; but by January 12, 1921, every one knew that the second condition was quite the reverse of true. Any debtor who bought a credit for a set-off was therefore sure to get upon it more than any

other creditor could get, and if he had reflected must have seen that he would. That is what the law forbids.

All this was reflected in what I may fairly call the "going price" for credits, which when the defendant bought was not more than 50 per cent. of their face. Of course, if the claims were valid, such a discount could not be accounted for merely by the delays incident to collection. It is argued, however, that their validity was in dispute, and this is true. Yet no one disputed that the debtor members were in some form and to some amount responsible for the coal they got. If the values actually fixed were too high, both credits and debits would be proportionately reduced. Let me for argument's sake assume that it was honestly supposed that the reduction would be by half, so that the credits would be liquidated at 50 per cent. and the debts paid in the same proportion. Even so, the exchange could not be solvent, because out of the sums collected must come, as I have said, all the expenses of collection, and the smaller the prices at which the settlements were finally liquidated the greater the per cent. which these charges would take.

Finally, it appears that the defendant knew that at least one of the debtor members was insolvent, and there were rumors about that several others were in doubtful condition. One may allow that a part of the discount was due to the uncertainty of what the final value of claims would be when allowed, and to the delay in their collection; but the whole situation was enough to put any reasonable man on notice of the truth, which was that under no circumstances could the exchange pay in full. Therefore I hold that the set-offs are invalid under the Bankruptcy Act, and that the defendant can avail itself of them only as a creditor.

Verdict directed for the plaintiff, with interest.