COYLE v. JOHNSTOWN COAL & COKE CO.

(District Court, S. D. New York. June 6, 1922.)

1. Exchanges ⬅9—Errors in commutation held not correctible after suit on the commutation.

Under rule 22 of the Tidewater Coal Exchange, obligating a member to restore his shortages of coal "immediately upon demand of the deputy commissioner," where the exchange made a detailed demand on a member for coal shortage, but through errors in bookkeeping, consisting of erroneously crediting 720 tons of coal to the member, such amount was erroneously omitted from the demand on which the member's commutation was fixed, but it did not appear that the member learned of the errors and disregarded the injunction at the foot of the account to advise the exchange of any corrections, no commutation was ever effected as to the 720 tons, and, no demand therefor having been made on the member until after process was served in the action against him on the commutation, no recovery for such coal could be had in such action.

2. Bankruptcy ⬅154—Claims purchased by debtor held not allowable as set-offs.

Claims against bankrupt, Tidewater Coal Exchange, purchased within four months prior to bankruptcy by a debtor member chargeable with

knowledge of its insolvency, at a large discount, *held* not rendered available as set-offs by the fact that they were acquired through an agent employed by the exchange to try to effect a settlement with all debtors and creditors.

At Law. Action by William Radford Coyle, trustee in bankruptcy of the Tidewater Coal Exchange, against the Johnstown Coal & Coke Company. Judgment for plaintiff.

James F. Curtis and Chauncey Belknap, both of New York City, for plaintiff.

Peale & McLaughlin, of New York City, for defendant.

LEARNED HAND, District Judge. In this case there are two questions only to be considered; the first as to 720 tons of coal erroneously credited to the defendant on the books of the exchange, and therefore omitted from its demand, and the second, the so-called "Baker settlement," or, in the event that this is considered invalid, a set-off arising from the purchase of a credit from Baker.

[1] The first error in the exchange's books was merely one of addition, amounting to 540 tons, which no one seems to have noticed. The second was in crediting pool 10, instead of debiting it, with 90 tons, when that amount was transferred from pool 10 to pool 11. These errors remained undiscovered, and went into the final demands for restoration, upon which eventually the commutation was fixed. While the errors are at once apparent when called to one's notice, it was not proved that the defendant learned them and disregarded the injunction at the foot of the account to advise the exchange of any corrections. I can hardly assume, without proof, that this was the case. Now, of course, this error must in some way be corrected and the defendant must pay for the coal with which it was thus mistakenly credited. Nor, indeed, does it deny that this is the case; its position is that it may pay for the coal at its value, to be ascertained, at some other time, just when it does not say. The theory is that a demand and an opportunity to restore in kind was a condition of commutation, and that the demand could not be general, at least not after it had in fact been stated in detail. Hence the commutation was irregular as to this coal.

Rule 22 of the exchange put it upon a member to restore his shortages "immediately on demand of the deputy commissioner." It is difficult to see how the member could be in default until a demand was in fact made. It might have been possible to make a blanket demand, but I think not; rather the exchange was bound to specify the tonnage to be restored. However that may be, the exchange having chosen to make a detailed demand, the plaintiff may not treat it as though it covered more than was claimed. I regard the right under rule 28 of "closing accounts" as conditional upon a demand, thereby giving an opportunity to restore in kind. If so, there could be no valid commutation of coal into money, unless this opportunity were given after demand made.

It follows that as to these tons the commutation was never effected, but they remained merely a shortage on which the defendant was in

default only upon demand made in April, 1922, after process served herein. Hence no recovery can be had in this action for those tons. No doubt the parties can settle as of the value at the time of the demand. While the result is a harsh one, and would not follow if the defendant could be shown to have recognized and suppressed the errors, as the record stands the only right of the exchange to create a debt to itself arose from the rules. Unless these were followed the situation remained what it had been, a series of coal pools from any obligation to which an overdrawing member might excuse himself by restoring in kind until his account was closed.

[2] The second point is the "Baker' settlement." The letter of November 1, 1920, addressed to all members, showed very clearly the limits of Baker's authority. He was to have a season, later extended to February 15, 1921, within which to acquire credits and set them off against debits. It was expressly stated that he was only to "canvass" for debits and credits, and that nothing was to be final unless arrangements were concluded "satisfactory to the executive committee for the closing of all accounts." Thus it was clearly announced that all was provisional, and all was conditional upon bringing in every member. The defendant's position involves two things: First, that Baker assumed to disregard his instructions, which were even more expressly limited than in the notice to members; and, second, that the executive committee, becoming aware of his action, ratified it and treated the settlements as separately valid.

On January 19, 1921, there was a meeting of the executive committee, at which Baker was present. The minutes show that he reported that he "had settled about 38 accounts and had arrangements with other members of the exchange for the settlement of about $100,000 additional within the next two or 3 days." He wished 30 days more to bring the rest down to 50 unclosed accounts, "when a meeting could be held between the 50 people and clean up the whole matter." So far there was nothing to indicate that any of these settlements had been unconditionally closed.

However, Baker had told Snider and Kinter, at a meeting in Philadelphia on December 27, 1920, that he would go ahead and take the chances of the approval of the executive committee on what he had done; also a day after the meeting of January 19, 1921, Baker drew up a report which shows that he supposed himself to be entitled to make "individual and partial settlements." It does not, indeed, appear whether this ever reached the knowledge of the executive committee; but in the absence of contradiction I think I should assume that it reached the exchange, and in the natural course of events it would be communicated to the proper authorities. It seems to me notice enough. In any case, the talk of December 27, 1920, had advised Snider that Baker meant to make individual shipments, and that alone put him on notice. Snider was the chairman and notice to him was notice to the committee.

On February 14, 1921, Baker made his final report. He said that over $267,000 of accounts had been assigned to him, over $259,000 of debts had been assumed, and that numerous accounts were in pro-

cess of settlement. It appeared that none of these changes had been entered on the books, but had merely been listed. Kinter then announced that he had told Baker that anything he did would have no legal effect till approved by the committee. Kinter was clearly concerned that all should so understand it. On February 21, 1921, the exchange issued a list of debits and credits showing in some cases a "Baker settlement."

However the committee may have saved its rights as against Baker, the evidence certainly indicates, to say no more, that they knew that Baker was going ahead to make individual settlements. They might perhaps have supposed that all the assignments and assumptions were taken conditionally upon Baker's getting everybody in; but the actual giving of the assignments is rather more consonant with a completed transaction than with a mere conditional agreement. If the point were material, I should hold that the inaction of the executive committee till May 25, 1921, bound them by what Baker had done, in view of the notice they had had of what he was doing.

In fact, the settlements amounted to no more than purchases of credits, and their validity depended on the validity of such purchases. If the set-offs were good the debts were wiped out; if they were not, the settlement amounted to nothing. In form they were indeed novations, and Baker became the debtor in the place of the defendant; but that was clearly not intended to be the true result. On March 11, 1921, Baker assigned the credit to the defendant, who accepted it, as did Howe. This was wholly inconsistent with any supposition that Baker was to become a real debtor to the exchange, except merely as a means of effecting the set-off. He was supposed by all to be merely a conduit for that purpose, and no one would for an instant have expected him to pay the debts, if the credits could not legally be used as a set-off. I regard the whole transaction as nothing but a means of allowing the credits to be so acquired, a purpose which was illegal, unless every creditor was brought in, as was in fact originally intended.

Therefore, even though Baker got a ratification for his separate settlements, it was invalid, unless the purchase of the credit was valid independently. The whole complicated affair raises nothing which in the end differs from the question raised in the McNeil Case (D. C.) 284 Fed. 298. It turns, then, on whether on January 13, 1921, the defendant had reason to believe that the exchange was insolvent. The same general considerations apply as before.

It is quite impossible to see how any one could suppose that the exchange could pay 100 cents on the dollar. The complication of its affairs had been obvious for long, and unless Baker could bring all the parties together it was clearly headed for a welter of litigation, which, without capital as it was, must be borne by the creditors out of the collections made. Insolvency was in that case inevitable. As in McNeil's Case, the heavy discount at which the set-off was obtained was a reflection of how much the uncertainty of collection weighed in the parties' minds.

Verdict directed for the plaintiff, with interest for the amount demanded, less the commuted value of 720 tons.