Benjamin H. Read, trading as Lynah & Read,

*vs.*

The Tidewater Coal Exchange, Inc., a dissolved corporation of the State of Delaware.

*New Castle, July* 21, 1922.

Equality is equity, and if a proposed method of settling debits and credits for coal in connection with coal pools conducted by a dissolved corporation would result in inequality among those whose rights stand on an equality, the receivers will be refused authority to adopt such method.

An incorporated coal exchange, organized by railroads and coal shippers to facilitate the handling of coal at the seaboard, *held* merely the manager of a series of pools, the coal in which was owned by the members of each pool collectively, and not itself the owner of the coal.

Where a coal exchange, organized to facilitate the handling of coal at the seaboard, did not own the coal, but merely managed coal pools, the coal in which belonged to the pool members, debit transactions for coal withdrawn from the pool were between the members, and general creditors of the exchange had no claim on the debits, so as to render it inequitable to permit receivers of the exchange, on dissolution, to bring about settlements of debit and credit tonnages between the members of the pools.

Where coal pools conducted by a coal exchange, organized to facilitate the the handling of coal, were all separate, and member's account in one pool had no bearing on his account in another, the debits and credits affecting each pool should be settled, on dissolution of the exchange, without regard to other pools.

In settling debits and credits affecting coal pools managed by a coal exchange, incorporated for that purpose, by bringing about settlements between the members of the pools, the exchange's receivers will be directed to effect no settlement in any pool, unless all debits and credits in that pool are settled, so that no liquidation can be effected, unless each member has received a settlement satisfactorily adjusting his rights.

Petition by receivers of Tidewater Coal Exchange, Inc., for authority to—

"permit and actively bring about settlements of credit and debit tonnages of members and others as shown on the books of the Exchange between themselves, so far as the same may be accomplished, and when such settlements are made to execute and deliver to such members and others thus settling their individual debit and credit tonnage balances, such releases and ac-

quittances to close their accounts, or establish the condition thereof as affected by such settlements."

A rule was issued to all parties in interest to show cause why the prayer of the petition should not be granted. On the return of the rule answers in opposition to the granting of the authority prayed for were filed by Chesapeake & Ohio Coal & Coke Company and Hall Bros. & Co., members of the Exchange, and Lewis Fuel Company, another member of the Exchange, by its solicitor appeared in opposition to the petition, but filed no answer.

*Herbert H. Ward*, of the firm of Ward, Gray & Neary, and *Gibbs L. Baker* and *Thomas R. Rutter*, of Washington, D. C., for receivers.

*Joseph Addison*, of Baltimore, Md., for Hall Bros. & Co., Inc.

*Charles W. Smith,* for Chesapeake & Ohio Coal & Coke Company.

*Tazewell T. Thomas*, of Baltimore, Md., for Lewis Fuel Company.

THE CHANCELLOR. It is urged in opposition to the petition of the receivers that to allow settlements of debits and credits to be made in the manner proposed by the receivers would permit one class of creditors to be preferred over other classes.

It is an ancient maxim that equality is equity. If the proposed method of settling the coal debits and credits will result in inequality among those whose rights stand on an equality, then, of course, this court ought to refuse the receivers the authority prayed for. In ascertaining what are the rights of interested parties, the nature and character of the facts and circumstances out of which they arise, and the mutual duties and obligations attending the relationships involved, are all to be consulted. This would suggest that I describe the purposes of the Exchange, the methods of its operations, the nature of its obligations, and the rights and liabilities of its members.

I am saved the necessity of doing this at great length at this time, because of another opinion heretofore filed in this cause (*ante p.* 195, 116 *Atl.* 898,) to which reference may be made for a statement of facts regarding the operations of the Exchange and the nature of its business. That opinion was written on the facts

then before me, and no new facts have since been adduced. In that opinion I used the following language:

" * * * It appears that the Exchange was a sort of trade agency created and maintained by railroads and coal shippers, to assist in removing the general adverse conditions existing at tidewater, conditions which were, as is well known, causing great and alarming concern along the entire eastern seaboard.

" * * * Those facts disclose that the Exchange handled no moneys except such as were necessary to pay the actual net cost of its operation. It bought no coal, though it could do so to the limited extent of securing sufficient tonnage to supply the debits of a member who had defaulted. But in such case, the purchase would not have been on its own account, but simply as an agent acting on account of the defaulting member. I believe, however, that it never assumed to exercise even this limited power. * * *

"It was simply an agency set up to aid in relieving a very considerable portion of industry from certain exigent difficulties which at the moment were causing great economic disturbance. * * * "

Upon further consideration, I see no reason to alter the views thus expressed. Indeed, their correctness is confirmed by the opinion of Judge Hand in the cases of *New River Collieries Co. v. Snider, et al.*, 284 *Fed.* 287, *Coyle, Trustee, etc., v. Morrisdale Coal Co.*, 284 *Fed.* 294, and *Coyle, Trustee, etc., v. McNeil & Sons Co., Inc.*, 284 *Fed.* 298, in the District Court of the United States, Southern District of New York, decided since the opinion heretofore handed down by me was filed.

Those cases concerned the affairs of an unincorporated association similar in general features to the Exchange here involved.

In the *New River Collieries Case* Judge Hand said.

"I think that it appears beyond controversy that the members always intended on occasion to loan or sell to pool members a part of the pool coal. * * *

"The members primarily meant to organize an association which should merely classify and mingle their coal into separate masses of which they were presumptively to remain co-owners. There is no sufficient reason to suppose that they intended the title to pass to the Exchange. So far, their purposes were the same as in the Lake Erie pool, which has served in general as a model for the Exchange. But it is equally clear that for reasons of convenience and speed in delivery, quite congenial with the general purposes of the Exchange,

they meant to go further than this, and to authorize their executive at his discretion to allow a pool member to take·out some of the common property of the pool on credit."

### In the *Morrisdale Coal Co. Case*, he said:

"As I have elsewhere said, I regard it as only a series of pools co-operatively managed by the Exchange, the coal being however owned by the members of each pool collectively. Therefore I do not believe that the Exchange had any right of action for failure to restore in kind to any given pool. So far as such rights exist at all, they belonged to the other co-owners of that pool, because it was carefully provided that the holdings of each pool should be separately regarded."

### In the *McNeil & Sons Co., Inc., Case*, he said:

· "I have already in the New River Colleries Case stated my reasons for believing that each pool was to be treated as a mass of fungibles owned in common, the shares being determinable by the deposits and withdrawals of the members.    *    *    *

"Under the rules of the Exchange the coal did lose its separate ownership when it arrived, but obviously it did not lose its traceable identity in fact. The result of the consignment was to transfer property in those cars to the pool members in common, but that was all. The transaction was like a sale to the pool members as a whole."

I do not have before me an official report of the case of *Coyle, Trustee, etc., v. Maderia Hill & Co.*, in the Supreme Court, City of New York. I am supplied, however, with what purports to be a correct copy of the court's opinion in that case. The copy thus supplied me represents the court as saying with respect to the same Exchange as the one involved in the cases above referred to in the Southern District of New York:

.    "I am of the opinion from the evidence in the case that by reason of the concededly excessive and erroneous demand for overdrafts and shortages made on defendant by the Exchange the rights of the defendant as they existed at the time of such demand were not cut off or limited by such demand, and that defendant still retained and retained at the time it acquired the credits herein pleaded as set-off against the plaintiff's claim the right to deal with its fellow members in the Tidwater Coal Exchange on the basis of exchange of debits and credits, as such right had existed ·from the beginning; and that as to this defendant under the evidence in this case the Tidewater Coal Exchange had no legal right to commute coal debits into cash as it did and thereby fix an arbitrary price as against the defendant.

"In this view I am confirmed by the opinion of Judge Learned Hand in the Johnstown Coal Co. Case in which he says: 'I regard the right under *Rule* 28 of closing accounts as conditional upon a demand, thereby giving an opportunity to restore in kind; if so there could be no valid commutation of coal into money unless this opportunity were given after demand made. This, of course, means a proper demand.'

"In my opinion there are questions of fact for the jury in this case. These questions of fact are: Was the price of $10.00, $11.00 fixed by the Executive Committee under the circumstances of this case reasonable to the defendant? Were the credits acquired by the defendant through Baker received and acknowledged by the Exchange and entered upon the books of the Exchange by order of the Commissioner? Were such credits acquired without knowledge or notice on the part of defendant of the insolvency of the Exchange?"

The views thus expressed by these courts, therefore, tend to confirm me in the opinion heretofore filed in this cause. There was no occasion for me to consider in that opinion the status of the various pools and the relationship of the Exchange members thereto. Those questions were passed on in the cases before Judge Hand and under the facts before me I accept his conclusions as correct here, namely, as he expressed it, the operation was "only a series of pools co-operatively managed by the Exchange, the coal being however owned by the members of each pool collectively." This must be so when it is remembered that the Exchange itself was not the owner of the coal and that under rule 27 it was provided that—

"The account of a member in one designated pool shall not have any bearing on his account in another pool at the same or other piers."

The excerpts above quoted are set out herein because the conclusions they announce are determinative of the disposition that should be made of the pending petition.

In another case (*Coyle, Trustee, etc., v. Johnstown Coal & Coke Co.*, 284 *Fed* 301) likewise before Judge Hand in the Southern District of New York, the action involved, *inter alia*, the right of the trustee in bankruptcy to recover from an Exchange member the value of seven hundred and twenty tons of coal erroneously credited to the defendant. Instead of being a creditor to the extent of this tonnage, he was in fact a debtor. The trustee was not allowed to recover the value of these tons, because no demand

therefor under the rules of the Exchange had ever been made until after process in the suit had been served. The court said:

" * * * As the record stands the only right of the Exchange to create a debt to itself arose from the rules. Unless these were followed the situation remained what it had been, a series of coal pools from any obligation to which an overdrawing member might excuse himself by restoring in kind until his account was closed."

This is a recognition of the right of a member to settle his debts with his co-members in each pool, at least until the Exchange had commuted the coal into money.

In the *Madeira Hill & Co. Case;* in the Supreme Court of New York, it would seem the same view was entertained, with this qualification, viz., if the demand for overdrafts and shortages was excessive and erroneous, then the member could ignore the demand and settle his debits by acquiring credits to balance them.

In the case before me there was no commutation of coal into money. The question now is: Shall the receivers be permitted to facilitate settlements of debits and credits among the members themselves in such manner as the members had the right to do heretofore? I can see no reason why they should not be permitted to do so, within proper limitations. If the coal dumped in each pool belonged to the pool members, then coal borrowed therefrom was owed to the pool members. There was no dumping for the account of the Exchange and no borrowing from the Exchange. The Exchange did not owe the credit member for coal dumped, nor did it possess a claim for goods sold and delivered against a debit member for coal withdrawn. The transactions with respect to pool ten, say, were between the members of pool ten, and the Exchange was simply the manager.

If this be so, then how can a creditor of the Exchange, a creditor who for convenience has been described as a general creditor, set up any just claim to be compensated out of the property of pool members? If the Exchange were now operating, could it be contended that a general creditor who has supplied it, for instance, with office equipment, would be entitled, after securing judgment, to levy on the pool coal at the piers for the Exchange debt? I think not. I do not perceive how such creditor has any better right under the receivership to resort to pool assets. If it be said

that such a result is hard on the general creditors in case the Exchange turns out to be insolvent, the evident reply is that the misfortune is only such as is common to all creditors who have extended credit to debtors who eventually become insolvent. Creditors cannot seize the property of third persons to pay an insolvent's debts.

Influenced by these considerations, I therefore am not impressed with the argument that the receivers ought to be required to turn all the debits for coal owed to the pools into cash, in order to create a fund in which general creditors of the Exchange may share *pari passu* with pool creditors in the adjustment. If it be that the suggested method of settlement might result in a hundred per cent. satisfaction of coal creditors, and satisfaction at less than one hundred per cent. of general creditors, because of the possible insolvency of the Exchange, such an outcome will be unfortunate but unavoidable. It will be due solely to the legal aspects of the situation of the parties and their contractual status with respect to the assets. It would not be due to a repudiation of the maxim that equality is equity.

It was urged that not only would the suggested method of settlement work a possible inequality as against general creditors, but that it would also work an inequality as among the members themselves, the credit members. As an illustration it is said that if credit members are allowed to secure payment themselves by exchanging coal credits for coal debits, it will be only because coal debtors will pay a sum in cash for the coal credit to the owner thereof; this will result in a scramble among the coal creditors to settle accounts with those of the coal debtors who are able to pay; and in the end, there being some coal debtors who are said to be insolvent, the unsettled coal credits outstanding (which must be equal in amount to the coal debits outstanding), which will stand off against valueless coal debits outstanding, will receive no satisfaction.

The fact should here be interpolated, perhaps, that under the scheme of operation of the Exchange, coal debits and coal credits always balanced. The facts before me show that such is the case. Some contention is made to the contrary, but I think the conten-

tion is not sustainable. I shall not, however, pause to give my reasons for this view.

I recur now to the suggested inequality that may result among the credit members. The argument made in this connection is worthy of attention. Unless safeguards are thrown around the proposed plan of settlement, the result suggested may ensue. But it can be avoided.

The fact that the pools are all separate and the account of a member in one designated pool shall have no bearing on his account in another pool (Rule 27), suggests the necessity of requiring that the settlements shall be carried on as pool affairs. Each pool must have the settlements proceed without regard to other pools. Not only so, but the receivers will be directed to effect no settlements in any one pool unless all debits and credits in that particular pool are settled and the pool account closed. This will keep the settlement procedure in harmony with the court's views concerning the structure of the Exchange and assure each pool member that no liquidation of the affairs of the pool in which he is a co-member can be effected unless he has received a settlement which satisfactorily adjusts his rights. There will be no compulsion on any coal creditor to settle on a given basis. He will be free to consult his own interest and act accordingly. If he voluntarily agrees to a given settlement, it will be only because he is satisfied. In such case I cannot see that an inequity will have been done him.

Let an order be prepared in accordance herewith.